UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

WESTERN DIVISION

| | |
|---|---|
| DAKOTANS FOR HEALTH, RICK WEILAND, ADAM WEILAND,<br><br>Plaintiffs,<br><br>vs.<br><br>BOB EWING, IN OFFICIAL CAPACITY; BRANDON FLANAGAN, IN OFFICIAL CAPACITY; RANDY DEIBERT, IN OFFICIAL CAPACITY; RICHARD SLEEP, IN OFFICIAL CAPACITY; ERIC JENNINGS, IN OFFICIAL CAPACITY; AND LAWRENCE COUNTY COMMISSIONERS, IN OFFICIAL CAPACITY;<br><br>Defendants. | 5:23-CV-05042-RAL<br><br><br>OPINION AND TEMPORARY RESTRAINING ORDER |

Plaintiffs Dakotans for Health, Rick Weiland, and Adam Weiland (Plaintiffs) have asked this Court to immediately restrain Lawrence County Commissioners from enforcing or threatening to enforce a Lawrence County Policy restricting ballot petition circulators to a designated area outside Lawrence County government buildings in Deadwood, South Dakota. The First Amendment to the United States Constitution, made applicable to South Dakota through the Fourteenth Amendment, prohibits the government from making laws that "abridge the freedom of speech, or of the press; or the right of people peaceably to assemble, and to petition the Government for a redress of grievances." U.S. Const. Amend. I. For the reasons discussed below, this Court grants to a limited extent Plaintiffs' motion for a temporary restraining order.

1

I.  **Background**

On Tuesday, June 20, 2023,[1] Plaintiffs sued Defendants Lawrence County Commissioners Bob Ewing, Brandon Flanagan, Randy Deibert, Richard Sleep, and Eric Jennings (collectively Defendants or Lawrence County Commissioners) in their official capacities as Lawrence County Commissioners seeking a temporary restraining order, preliminary and permanent injunctive relief, attorney's fees and costs, and invoking federal jurisdiction under 42 U.S.C. § 1983 and 28 U.S.C. §§ 1331, 1343(3). Doc. 1. The Complaint pleads one cause of action (entitled "Unconstitutional Restriction of Core Political Speech") asking this Court to declare the Lawrence County Political Activity Policy (the Policy) an unconstitutional restriction on Plaintiffs' right to engage in core political speech. Id. at ¶¶ 22–29. Plaintiffs' Motion for Temporary Restraining Order, Doc. 2, four supporting declarations, Docs. 3–6, and brief in support of their motion, Doc. 7, request an order under Federal Rule of Civil Procedure 65(b) immediately restraining Defendants from enforcing or threatening to enforce the Policy and waiving any bond requirement.

As this Court remarked recently in a case with identical Plaintiffs and similar legal issues, on an ex parte motion for temporary restraining order under Rule 65(b), a court should be cautious not to make any factual conclusions. See Dakotans for Health v. Anderson, 4:23-CV-04075-RAL, Doc. 10 at 2. Although the facts here differ from those in Dakotans for Health v. Anderson, the issues and analysis are similar.

Plaintiff Dakotans for Health is a South Dakota ballot question committee, Plaintiff Rick Weiland is its chair, and Plaintiff Adam Weiland works for the entity and helps manage it. Doc. 1 ¶¶ 1–4. Plaintiffs drafted and are involved in circulating petitions to place measures on the November 2024 ballot in South Dakota that, as they put it, "would allow the people of South

---

[1] The case was reassigned to the undersigned judge yesterday.

Dakota to choose to restore their <u>Roe v. Wade</u> rights, and to eliminate the state sales tax on food." Doc. 1 ¶ 9. Plaintiffs employ volunteer and paid circulators to circulate their petitions and obtain signatures from registered voters to qualify the measures for the ballot. Id. ¶ 10. This lawsuit concerns Plaintiffs' petition circulation activities around Lawrence County government buildings located in the county seat of Deadwood, South Dakota. Id. ¶ 14. Deadwood—famous for its history as a gold mining settlement in the nineteenth century and scenic location in the Black Hills—is heavily trafficked by tourists each year and is the situs of many government services for the broader Lawrence County population of approximately 27,000 people.

According to Plaintiffs, the Lawrence County Courthouse and Administrative Annex buildings (referred to as "the Lawrence County Campus" or "the Campus") in Deadwood have historically been where their circulators station themselves to engage with potential petition signers and discuss political issues. Doc. 3 ¶ 7; Doc. 4 ¶ 12. The Campus (specifically the Annex building) houses the offices of the County Treasurer, Auditor, Commissioners, Public Assistance, Equalization, Planning and Zoning, Register of Deeds, Computer Department, State's Attorney, and Public Defender. Doc. 1 ¶ 17. Plaintiffs view the Campus as an ideal place to collect signatures because "[m]ore voters use the [Lawrence County Campus] than any other public building in Lawrence County." Doc. 1 ¶¶ 12–13. Plaintiffs' lawsuit maintains that while the Lawrence County Campus is an "excellent location[] at which to collect signatures to place an initiated measures the ballot," the Lawrence County Commission adopted a resolution on March 10, 2020, restricting where petition circulators are allowed on the Campus that unconstitutionally interferes with their political activities there. Doc. 1 ¶¶ 13, 24.

Resolution #2020-09 (attached to the Complaint as Exhibit 1) contains the challenged Policy and its justification. Doc. 1-1 at 1–2. The justification section of the Policy reads:

> The Lawrence County Commission has approved the following political activity policy. All petition circulators shall abide by the policy while circulating petitions on the Lawrence County campus.
>
> Lawrence County buildings are public facilities that exist to accommodate the business of the county government and the courts. In an effort to preserve public safety and provide citizens the opportunity to conduct business without unnecessary disruption or inconvenience, circulators of petitions may use the specifically designated area at the selected facility on the Lawrence County Campus to gather signatures.

Id. at 1. The Policy goes on to define "designated areas" where signature gathering is permitted on the Campus: petition circulation is permitted inside neither the Lawrence County Annex building nor the Lawrence County Courthouse and is limited to the outdoor "plaza area" between those two buildings. Id. at 1. The Policy goes on to provide a Code of Conduct for petition circulators:

> Petition Circulators are notified:
>
> ➢ A circulator may approach persons for the purpose of politely asking for a petition signature, provided the circulator is within the prescribed area referenced in this Policy;
>
> ➢ A circulator may engage in discussion, but shall not verbally or physically harass, threaten or intimidate any person for any reason;
>
> ➢ A circulator shall respect the right of a person to decline to sign a petition;
>
> ➢ A circulator shall not at any time prevent or interfere with ingress/egress of any person to or from a County building; and
>
> ➢ A circulator may not use any County equipment, supplies or services when gathering Signatures
>
> **Failure to abide by the terms of the above described Code of Conduct shall result in the circulator being asked to leave the County premises. Further, failure to abide by the terms of the Code of Conduct may result in removal and/or arrest by law enforcement

Id. at 2.

According to the Plaintiffs, the Policy prohibits petition circulation in and on *all* sidewalks in front of the Administrative Annex building, which houses numerous public services, and restricts circulators to "one small, out-of-the-way area." Doc. 1 ¶ 24. They say the designated area isolates petition circulators from the parking lots to the west and south of the Annex building, away from sidewalks where "almost everyone enters and leaves the Administrative Annex Building." Doc. 7 at 5. Leah Bothamley, a petition circulator for Dakotans for Health, avers in her declaration, Doc. 5, that on June 12, 2023, she was standing on the sidewalk in front of the Annex building when a woman who appeared to be a county employee approached her and handed her a copy of the Policy; Bothamley then moved to the designated area, where it was "obvious to [her] that this would be a much poorer location from which to attempt to obtain petition signatures." Doc. 5 ¶ 2–5. In Plaintiffs' view, Defendants' Policy restricting their petition circulators to the outdoor plaza in between the two buildings on the Campus makes them significantly less effective at gathering signatures and unconstitutionally infringes on their First Amendment rights. Doc. 4 ¶ 12; Doc. 7 at 14.

Plaintiffs' Complaint attached a screenshot from Google Maps of the area of the entrance commonly used by the public to enter the Administrative Annex building. Doc. 1-4. This Court, rather than relying on this single image and to better educate itself on the physical characteristics of the area around the Lawrence County Campus, used Google Maps to view its depiction of the entire Campus. This Court ultimately will want input from the parties on whether Google Map images are sufficiently reliable to use in place of personally viewing the premises but wants to be transparent with the parties on information this Court has accessed in ruling on the motion for temporary restraining order. The images show that the County Campus is surrounded by what appears to be a wraparound public sidewalk that lies parallel and perpendicular to Center Street,

Sherman Street, and Pine Street. The sidewalk appears to provide access not only to the County Campus buildings, the outdoor plaza, and what Plaintiffs say is the most used south entrance to the Annex building, but also to a parking lot and parking garage where this Court assumes the public may park to access the Campus or downtown Deadwood in general. Defendants' Policy thus appears to remove public sidewalks from petition circulation activity and confine that activity to the outdoor plaza. The outdoor plaza looks to be a nice area for a gathering or group protest, but removes petition circulators from where they would or could approach pedestrians on public sidewalks adjacent to county buildings. The policy on initial blush appears to be overly restrictive and prevents petition circulators from peacefully exercising their First Amendment rights to which they are entitled on public or traditionally public forums around this kind of government property.

## II.     Legal Standard

Rule 65 of the Federal Rules of Civil Procedure provides as follows:

**(b) Temporary Restraining Order.**

> **(1)** *Issuing Without Notice.* The court may issue a temporary restraining order without written or oral notice to the adverse party or its attorney only if:
>
>> **(A)** specific facts in an affidavit or a verified complaint clearly show that immediate and irreparable injury, loss, or damage will result to the movant before the adverse party can be heard in opposition; and
>>
>> **(B)** the movant's attorney certifies in writing any efforts made to give notice and the reasons why it should not be required.
>
> **(2)** *Contents; Expiration.* Every temporary restraining order issued without notice must state the date and hour it was issued; describe the injury and state why it is irreparable; state why the order was issued without notice; and be promptly filed in the clerk's office and entered in the record. The order expires at the time after entry—not to exceed 14 days—that the court sets, unless before that time the court, for good cause, extends it for a like period or the adverse party consents to a longer extension. The reasons for an extension must be entered in the record.
>
> **(3)** *Expediting the Preliminary-Injunction Hearing.* If the order is issued without notice, the motion for a preliminary injunction must be set for hearing at the earliest

>possible time, taking precedence over all other matters except hearings on older matters of the same character. At the hearing, the party who obtained the order must proceed with the motion; if the party does not, the court must dissolve the order.
>
>**(4)** *Motion to Dissolve.* On 2 days' notice to the party who obtained the order without notice—or on shorter notice set by the court—the adverse party may appear and move to dissolve or modify the order. The court must then hear and decide the motion as promptly as justice requires.

"A district court considering injunctive relief evaluates [a] the movant's likelihood of success on the merits, [b] the threat of irreparable harm to the movant, [c] the balance of the equities between the parties, and [d] whether an injunction is in the public interest." Powell v. Ryan, 855 F.3d 899, 902 (8th Cir. 2017) (citing Dataphase Sys., Inc. v. C L Sys., Inc., 640 F.2d 109, 114 (8th Cir. 1981) (en banc)). "No single factor is dispositive, as the district court must balance all factors to determine whether the injunction should issue. However, in deciding whether to grant a preliminary injunction, likelihood of success on the merits is most significant." Turtle Island Foods, SPC v. Thompson, 992 F.3d 694, 699 (8th Cir. 2021) (cleaned up and citations omitted).

The focus in considering a temporary restraining order is whether the moving party "clearly show[s] that immediate and irreparable injury, loss or damage will result to the movant before the adverse party can be heard in opposition." Fed. R. Civ. P. 65(b)(1)(A). Although the Dataphase factors do not apply under the language of the rule to the decision to grant a temporary restraining order, this Court will consider each Dataphase factor here, with a particular focus on the first and second factors.

### III. Discussion

#### A. The movant's likelihood of success on the merits

The First Amendment prohibits the government from "abridging the freedom of speech . . . and to petition the Government." U.S. Const. amend. I. Thomas Jefferson, whose face adorns a

7

mountainside not far from Deadwood, recognized that "public discussion is a political duty" and a "fundamental principle of the American government." Whitney v. California, 274 U.S. 357, 375 (1927) (Brandeis, J., concurring). That principle, enshrined in the First Amendment and valued by South Dakota since 1898 when it became the first state to give ordinary citizens the power to initiate laws through the popular vote, protects the right of petition circulators to reasonably engage in public discussion outside of government buildings.

The First Amendment's protection is "at its zenith" when "core political speech" like petition circulation is involved. U.S. Const. amend. I; Buckley v. Am. Const. L. Found., 525 U.S. 182, 186–87 (1999) (cleaned up and citation omitted)). The question here is how this protection applies when the petition circulation occurs on or adjacent to government property, here on or adjacent to the Lawrence County Campus. Like a private property owner, the government "has the power to preserve the property under its control for the use to which it is lawfully dedicated." United States v. Grace, 461 U.S. 171, 178 (1983) (cleaned up and citation omitted). The First Amendment does not require the government to "freely . . . grant access to all who wish to exercise their right to free speech on every type of Government property without regard to the nature of the property or to the disruption that might be caused by the speaker's activities." Cornelius v. NAACP Legal Def. & Educ. Fund, Inc., 473 U.S. 788, 799–800 (1985). Instead, the government's ability to limit free speech on its property depends on the "nature of the forum" in which the free speech occurs. Id. at 800; Ball v. City of Lincoln, 870 F.3d 722, 729 (8th Cir. 2017).

The government's authority to limit speech is at its lowest in traditional public forums like public streets, parks, and sidewalks. See Grace, 461 U.S. at 177 (noting that "streets, sidewalks, and parks, are considered, without more, to be public forums" and that government authority to restrict speech in these areas "is very limited") (cleaned up and citation omitted)); Schenck v. Pro-

Choice Network of W. N.Y., 519 U.S. 357, 377 (1997) ("[S]peech in public areas is at its most protected on public sidewalks, a prototypical example of a traditional public forum."). The government may impose reasonable time, place, and manner restrictions in public forums, but only if those restrictions are content neutral,[2] "narrowly tailored to serve a significant governmental interest," and "leave open ample alternative channels for communication of the information." Ward v. Rock Against Racism, 491 U.S. 781, 791 (1989) (cleaned up and citation omitted). This same test applies to designated public forums, which are created when the government "intentionally open[s] a nontraditional forum for public discourse." Cornelius, 473 U.S. at 802; Pleasant Grove City v. Summum, 555 U.S. 460, 469–70 (2009) (explaining that the same standard governs restrictions on speech in public forums and designated public forums).

The government has more leeway to regulate speech in nonpublic forums, meaning "government property that is not by tradition or designation a forum for expressive activities by the public." Ball v. City of Lincoln, 870 F.3d 722, 730 (8th Cir. 2017) (cleaned up and citation omitted). Restrictions on speech in a nonpublic forum pass muster so long as they are "reasonable and are not an effort to suppress expression merely because public officials oppose the speaker's view." Cornelius, 473 U.S. at 800 (cleaned up and citation omitted). These restrictions "'need not be the most reasonable or the only reasonable limitation' to be constitutionally permissible." Ball, 870 F.3d at 730 (quoting United States v. Kokinda, 497 U.S. 720, 730 (1990)).

---

[2] Defendants' Policy appears to be content-neutral. Of course:
> Content-based laws—those that target speech based on its communicative content—are presumptively unconstitutional and may be justified only if the government proves that they are narrowly tailored to serve compelling state interests. Courts will apply a strict scrutiny analysis when the regulation discriminates on the basis of content, and a more lenient analysis to content-neutral regulations.

Josephine Havlak Photographer, Inc. v. Vill. of Twin Oaks, 864 F.3d 905, 913–14 (8th Cir. 2017) (cleaned up and citations omitted).

Because the nature of the forum prescribes the level of constitutional protection, this Court must consider whether the sidewalk outside the Lawrence County Campus is a public or nonpublic forum. Public streets and sidewalks "occupy a special position in terms of First Amendment protection because of their historic role as sites for discussion and debate." McCullen v. Coakley, 573 U.S. 464, 476 (2014) (cleaned up and citation omitted). Public sidewalks are critical to the "exchange of ideas" because they provide access to people who might otherwise ignore the speaker's message. Id. Some sidewalks present easy questions concerning their forum status. In Grace, for instance, the Supreme Court held that the sidewalks "comprising the outer boundaries" of the Supreme Court grounds were a public forum. 461 U.S. at 179. These sidewalks were "indistinguishable from any other sidewalks in Washington, D.C.," and there was "no separation, no fence, and no indication whatever to persons stepping from the street to the curb and sidewalks that serve as the perimeter of the Court grounds that they have entered some special type of enclave." Id. As such, the Supreme Court saw "no reason why [these sidewalks] should be treated any differently" than traditional sidewalks, which are "considered, generally without further inquiry, to be public forum property." Id. at 179.

A public sidewalk running along Center, Sherman, and Pine streets surrounds the Lawrence County Campus. The petition circulator for Dakotans for Health was standing on a public sidewalk in front of the Annex building when a woman who appeared to be a county employee approached her with the Policy on June 12, 2023, directing her to move to the designated area in the plaza area. If the Policy in fact is read to place off-limits petition circulation on public sidewalks, then Defendants appear to be restricting First Amendment activity in a public forum.

Because the sidewalk outside of the Annex building appears to be a public forum, the policy to be constitutional must be "narrowly tailored to serve a significant governmental interest" and

"leave open ample alternative channels for communication of the information." Ward, 491 U.S. at 791 (cleaned up and citation omitted). The "narrow tailoring requirement means not only that the regulation must promote a substantial government interest that would be achieved less effectively absent the regulation, but also that the factual situation demonstrates a real need for the government to act to protect its interests." Johnson v. Minneapolis Park & Recreation Bd., 729 F.3d 1094, 1099 (8th Cir. 2013) (cleaned up and citations omitted). The protected interest cannot be abstract, and instead "there must be a genuine nexus between the regulation and the interest it seeks to serve." Id.

The Supreme Court made clear in McCullen v. Coakley that the "government still may not regulate expression in such manner that a substantial portion of the burden on speech does not serve to advance its goals." 573 U.S. at 486 (cleaned up and citation omitted). McCullen involved a Massachusetts statute that prohibited people from knowingly standing on a public walkway or sidewalk within 35 feet of an entrance or driveway to an abortion clinic. Id. at 469. The plaintiffs were anti-abortion advocates who engaged in "sidewalk counseling" by offering women approaching the clinics information about alternatives to abortion and trying to dissuade them from terminating their pregnancies. Id. at 472–73. The plaintiffs' sidewalk counseling strategy involved quiet, individualized conversations with the women, as they believed this approach was far more effective than more confrontational methods like yelling or waiving signs. Id. at 473. The plaintiffs claimed that the Massachusetts statute's creation of buffer zones around the clinics significantly hindered their ability to pass out literature and engage in face-to-face conversations. Id. at 474.

The Supreme Court held that the statute was not narrowly tailored because it burdened substantially more speech than was necessary to further Massachusetts' legitimate interest in

11

"public safety, patient access to healthcare, and the unobstructed use of public sidewalks." Id. at 486. The statute's main failure, the Court explained, was its significant burden on the plaintiffs' sidewalk counseling:

> [T]he buffer zones impose serious burdens on petitioners' speech. At each of the three Planned Parenthood clinics where petitioners attempt to counsel patients, the zones carve out a significant portion of the adjacent public sidewalks, pushing petitioners well back from the clinics' entrances and driveways. The zones thereby compromise petitioners' ability to initiate the close, personal conversations that they deem essential to "sidewalk counseling."

Id. at 487. These buffer zones likewise "made it substantially more difficult for petitioners to distribute literature to arriving patients." Id. at 488. The Court rejected Massachusetts' attempt to downplay these burdens, explaining that the government "imposes an especially significant First Amendment burden" when it frustrates methods of communication like leafleting and personal conversations. Id. at 489.

As for the narrowly tailored analysis, the Court concluded that Massachusetts "too readily for[went] options that could have" accomplished its interests without substantially burdening the plaintiffs' speech. Id. at 490. The Court noted multiple less burdensome alternatives, including another statute that already criminalized much of the conduct Massachusetts sought to prevent, statutes from other jurisdictions, and the enforcement of existing local ordinances. Id. at 490–94. It was "not enough," the Court explained, that the buffer zones would have made it easier to accomplish the state's goals. Id. at 495. Rather, the state needed to "demonstrate that alternative measures that burdened substantially less speech would fail to achieve the government's interests." Id.; see also id. ("A painted line on the sidewalk is easy to enforce, but the prime objective of the First Amendment is not efficiency.").

"In the context of petition campaigns, [the Supreme Court has] observed that 'one-on-one communication' is 'the most effective, fundamental, and perhaps economical avenue of political discourse.'" McCullen, 573 U.S. at 488 (quoting Meyer v. Grant, 486 U.S. 414, 424 (1988)). "When the government makes it more difficult to engage in [this] mode of communication, it imposes an especially significant First Amendment burden." Id. at 489. Defendants' Policy appears to hamstring the Plaintiffs' chosen method of communication by requiring them to remain in a plaza apart from pedestrian traffic into the Lawrence County Annex building; the plaza is on the opposite side from what appears to be the common entrance to the Annex building and a petition circulator would have to call out to those passing on sidewalks. See id. ("It is easier to ignore a strained voice or a waiving hand than a direct greeting or an outstretched arm.").

Requiring petition circulators to remain in the designated areas also burdens substantially more speech than necessary to achieve Defendants' interests expressed in the Policy's justification. This Court only has the language of the Policy itself—that is, "to preserve public safety and provide citizens the opportunity to conduct business without unnecessary disruption or inconvenience"—to understand the justification for the Policy. Preserving public safety and allowing citizens to conduct business with the county without unnecessary disruption or inconvenience are worthy and strong governmental interests. These justifications, however, do not explain in any meaningful way why petition circulators must be taken off a public sidewalk and placed in a plaza area away from pedestrian traffic. There appears to be ample space in and along the public sidewalks around the building and main County Campus entrance for petition circulators to stand without obstructing pedestrian traffic into or around the buildings. Indeed, there even appears to be a bench for people to sit and a cigarette disposal container immediately outside the Annex building entrance. If there is room for people to sit and smoke on the public

sidewalk right next to the most used entrance to the County Annex building, Plaintiffs are likely to succeed on the merits of their claim that there is ample room for exercising fundamental First Amendment rights in that space, too. The other portions of the Policy may address the Defendants' concern without imposing a significant burden on Plaintiffs' method of communication. In short, if the Defendants' Policy was meant to put the public sidewalks off limits to petition circulators and confine them to the plaza area, it does not appear to be sufficiently narrowly tailored to withstand a constitutional challenge.

### B. The threat of irreparable harm to the movant

"Irreparable harm occurs when a party has no adequate remedy at law, typically because its injuries cannot be fully compensated through an award of damages." Gen. Motors Corp. v. Harry Brown's, LLC, 563 F.3d 312, 319 (8th Cir. 2009). "In order to demonstrate irreparable harm, a party must show that the harm is certain and great and of such imminence that there is a clear and present need for equitable relief." Novus Franchising, Inc. v. Dawson, 725 F.3d 885, 895 (8th Cir. 2013) (citation omitted). The irreparable nature of the harm stemming from First Amendment violations is well-recognized. Powell v. Noble, 798 F.3d 690, 702 (8th Cir. 2015) (quoting Marcus v. Pub. Television, 97 F.3d 1137, 1140 (8th Cir. 1996)) ("If [the Plaintiffs] are correct and their First Amendment rights have been violated, this constitutes an irreparable harm." (citation omitted)).

Unlike in Anderson, Plaintiffs here challenge a policy that has been in place for more than three years. "Without question, '[a] long delay by plaintiff after learning of the threatened harm . . . may be taken as an indication that the harm would not be serious enough to justify a preliminary injunction.'" Adventist Health System/SunBelt, Inc. v. U.S. Dept. of Health & Human Servs., 17 F.4th 793, 805 (8th Cir. 2021) (quoting Wright & Miller, 11A Fed. Prac. & Proc., § 2948.1 & n.13

(3d ed. 2013)). Because of the delay, Plaintiffs here may have to clear a hurdle that was not present in Anderson, where the lawsuit was brought mere days after the challenged policy went into effect. On the other hand, the Bothamley Declaration shows Plaintiffs suffered a harm as recently June 12, 2023, Doc. 5, and perhaps that was the first time the policy has been enforced directly to the detriment of Plaintiffs. This case presents a closer call on irreparable harm than in Anderson. Because "the loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury," this factor weighs somewhat in favor of temporary and immediate relief. Elrod v. Burns, 427 U.S. 347, 373 (1976).

### C. The balance of equities between the parties

Plaintiffs have demonstrated that as recently as June 12, 2023, they have suffered what appears to be action undermining their fundamental First Amendment rights. Plaintiffs do not appear to challenge the "Code of Conduct" portion of the policy, nor in all likelihood could they, so restraining enforcement of the designated area portion of the policy is unlikely to harm Defendants. That is, even if Plaintiffs are allowed to conduct their activities outside of the currently designated area, the requirements that they do so politely and without interfering with ingress or egress of any person to or from a County building should protect Defendants from harm in the interim. The balance of equities or balance of harms analysis seems to favor Plaintiffs.

### D. Whether an injunction is in the public interest

"When the . . . government or agency is the defendant, the final two factors [i.e. the balance of equities between the parties and whether an injunction is in the public interest] can 'merge' into one." Noem v. Haaland, 542 F. Supp. 3d 898, 925 (D.S.D. 2021) (cleaned up and citation omitted); see also Nken v. Holder, 556 U.S. 418, 435 (2009) (stating the same). "The public interest generally is served by allowing the free exercise of First Amendment rights." Blue State Refugees

15

v. Noem, No. 3:21-CV-3024-RAL, 2021 WL 5150358, at *4 (D.S.D. Nov. 5, 2021). The public has an interest to enter and leave county buildings without undue traffic flow problems that petition circulators might create. Especially given the Policy's Code of Conduct, there is nothing to suggest that pedestrian traffic flow is, has, or could be a serious issue here if Plaintiffs are allowed to exercise their First Amendment rights elsewhere from the public sidewalks and not just from the designated area on the outdoor plaza.

### E. Bond

Under Rule 65(c), a temporary restraining order should issue "only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." A temporary restraining order as sought by Plaintiffs does not cause Defendants to incur "costs and damages" apart from the costs of defending this suit generally, which do not increase through entry of a temporary restraining order. The bond requirement may properly be waived in public interest litigation. Richland/Wilkin Joint Powers Auth. v. U.S. Army Corps of Eng'rs, 826 F.3d 1030, 1043 (8th Cir. 2018).

### IV. Conclusion and Order

For the reasons explained, it is

ORDERED that Plaintiffs' Motion for Temporary Restraining Order with Notice, Doc. 2, is granted to the limited extent that Defendants may not enforce or threaten to enforce the portion of the Lawrence County Political Activity Policy that restricts petition circulation to the designated area in the plaza area located between the Lawrence County Administrative Annex building and the Lawrence County Courthouse. Defendants may otherwise enforce provisions of the Policy. It is further

ORDERED that the parties cooperate with this Court to set an evidentiary hearing on the motion for preliminary injunction. It is further

ORDERED that this order shall remain in place for no more than 14 days and that the parties cooperate in setting a preliminary injunction hearing at the earliest possible time before this Court. It is finally

ORDERED that the bond requirement is waived.

DATED at ___4___ : ___48___ p.m. this 22nd day of June, 2023.

BY THE COURT:

_____
ROBERTO A. LANGE
CHIEF JUDGE